# APPENDIX C

JOSEPH LUTZ - April 26, 2007

Page 1

CAUSE NO. 874676

| | | |
|---|---|---|
| UNIFUND CCR PARTNERS, | ) | IN THE COUNTY CIVIL COURT |
| Plaintiff, | ) | |
| v. | ) | AT LAW NO. 1 |
| GERIANNE M. HUFFMAN, | ) | |
| Defendant. | ) | OF HARRIS COUNTY, TEXAS |

**************************************************

ORAL DEPOSITION OF

JOSEPH LUTZ

APRIL 26, 2007

**************************************************

      ORAL DEPOSITION of JOSEPH LUTZ, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 26th of April, 2007, from 9:13 a.m. to 11:11 a.m., before Peggy A. Hebert, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Hull & Associates, P.C., 6200 Savoy, Suite 440, Houston, Texas 77036, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

HEBERT REPORTING SERVICE
(713) 626-2629

62627cd5-1dd6-4b43-ace7-985f54cd4619

JOSEPH LUTZ - April 26, 2007

5 (Pages 14 to 17)

Page 14

1    A.   That sounds about right.
2    Q.   So you might sign between 45 to 50 of these per
3  day that you're at the office?
4    A.   I'd say that's a reasonable sum, yes, sir.
5    Q.   Reasonable estimate, anyway?
6    A.   Yes.
7    Q.   Let me go through this, and I'm going to take
8  this paper clip off. What we have with Exhibit No. 1 on
9  the top is a two-page affidavit signed by you; correct?
10   A.   Yes.
11   Q.   And then next there is something called an
12 "Affidavit of Indebtedness" signed by Kim Kenney?
13   A.   Yes.
14   Q.   She's also with Unifund; correct?
15   A.   That's correct. Her office is right around the
16 corner from mine.
17   Q.   All right. The next document on Exhibit No. 1
18 is something called a "Unifund Statement"?
19   A.   That's correct. That is never sent to the
20 debtor. That's sent to the law firm only.
21   Q.   All right. And then with this particular
22 affidavit there's an additional 13 pages of documents
23 that are marked Citi Platinum Select Card?
24   A.   That's correct.
25   Q.   And these purport to be computer copies of

Page 15

1  monthly statements from Citibank?
2    A.   That's correct.
3    Q.   Okay. But they're not copies of the originals?
4  They're more or less a computer version of them;
5  correct?
6    A.   They are the same as the copy -- as the
7  statement which was mailed to your debtor.
8    Q.   All right. Let me --
9    A.   They're electronically prepared under the same
10 method as the statement which goes to the debtor.
11   Q.   Have you ever worked for Citibank?
12   A.   No, but I visited --
13   Q.   No, no, no. I'm just asking. I'll ask more
14 questions. Have you ever worked for Citibank?
15   A.   No.
16   Q.   All right. Back to these documents. The top
17 two pages of Exhibit 1 are the affidavit that's signed
18 by you. That's generated by Unifund; correct?
19   A.   The affidavit itself?
20   Q.   Yes.
21   A.   That was generated by Hull and sent to us for
22 my signature.
23   Q.   All right. So basically you get different form
24 affidavits from different law firms?
25   A.   That's correct.

Page 16

1    Q.   All right. Do you know how many of these you
2  sign per month for Hull & Associates?
3    A.   No.
4    Q.   No sense of that? It's just you get so many?
5    A.   No, I just don't know. I mean, I get --
6  usually, when I get back to the office tomorrow, I'll
7  have maybe 100 affidavits, and there might be seven from
8  Hull and ten from Regent and you go on down the line,
9  and I have no idea --
10   Q.   All across the country?
11   A.   That's correct.
12   Q.   Okay. But -- all right. Let me see if I have
13 this right, then. With regard to Exhibit No. 1, the top
14 two pages is an affidavit for you to sign. That's
15 generated by the lawyer for Unifund --
16   A.   That's correct.
17   Q.   -- who will be in the field?
18   A.   That's correct. I'm sorry.
19   Q.   Not in Cincinnati?
20   A.   That's right.
21   Q.   All right. But then the next page, which is
22 the affidavit of indebtedness, this is actually
23 generated by Unifund; correct?
24   A.   That's correct.
25   Q.   And then the next page, which is called the

Page 17

1  "Unifund Statement," marked on this one Exhibit A, this
2  is also generated by Unifund?
3    A.   That's correct.
4    Q.   Then the last 13 pages here that have the --
5  that are denominated Citi Platinum Select Card, these
6  would have been generated by Citibank. Am I right?
7    A.   That's correct.
8    Q.   These 13 pages, were they mailed or e-mailed or
9  faxed to Unifund by the bank?
10   A.   I request them, and they are electronically
11 sent to me.
12   Q.   Okay. So the transmission from Citibank to
13 Unifund is an electronic transmission?
14   A.   That's correct.
15   Q.   Okay. Who specifically at Unifund arranged for
16 the transmission of these documents to Unifund from
17 Citibank?
18   A.   When we purchase a block of charged off credit
19 card debt, we are given access to all the accounts in
20 that block by Citibank. When we have an account number
21 that we decide to pursue and turn over to attorneys, we
22 then request, and I could be -- there's three of us.
23 Kim Kenney, I, and Jeff Schaeffer, I would assume, can
24 request these documents. And I don't know for sure
25 about Jeff because he's just a head of our entire

JOSEPH LUTZ - April 26, 2007

13 (Pages 46 to 49)

### Page 46

1    Q.  That's not my question.
2    A.  I understand what you're saying.  No, I
3 haven't.
4    Q.  Okay.  Now, looking at the 13 pages that have a
5 reference to Citi on them that are attached to
6 Exhibit No. 1, is either the sum of $6,107.47 or
7 $13,156.48 to be found on any of them?
8    A.  I'm trying to see the sequence, if they have
9 it.
10   Q.  I think they're in an order, but I don't
11 remember whether it's ascending or descending.
12   A.  I think they're in chronological order, yeah.
13       No.
14   Q.  Okay.  I looked at the last record in there.  I
15 think the latest one is dated November 12th of 2002, and
16 I think it may be on the bottom.  And doesn't it reflect
17 a balance of $5,824.78?
18   A.  That's correct.
19   Q.  My understanding is that, with most credit card
20 accounts, they are subject to unilateral change by the
21 credit card issuer.  Is that a fair statement?
22   A.  I'm sorry?
23   Q.  Hopefully I can remember it.  It's my
24 understanding with most credit cards, that they are
25 subject to unilateral change by the credit card issuer;

### Page 47

1 isn't that right?
2    A.  That's correct.
3    Q.  And one of those unilateral changes that they
4 can impose, the credit card issuer can impose, is a
5 change in the interest rate?
6    A.  That's correct.
7    Q.  So if you don't have all the monthly
8 statements, you don't know the interest rate that was
9 imposed from month to month to month during the entire
10 time period of this account, do you?
11   A.  Generally speaking, down here it shows the
12 interest rate that was charged at specific times.
13   Q.  And doesn't it change from month to month?
14   A.  Depending on the reliability of the credit card
15 holder.
16   Q.  I understand that, but I'm just asking --
17   A.  Yeah.  Yes, it changes month to month.
18   Q.  And the problem here is we only have some of
19 those monthly statements?
20   A.  That's correct.
21   Q.  And they're not even in exact adjacent order to
22 one another; isn't that right?
23   A.  I guess, yes.
24   Q.  There are gaps between them?
25   A.  Yes.

### Page 48

1    Q.  So we don't have exact proof of what the
2 interest rates were for the period -- the last -- during
3 the entire period of her account; isn't that right?
4        MS. BRIGGS:  Objection.  Form.
5    Q.  (By Mr. Tomlinson)  We don't know that?
6    A.  That's correct.
7    Q.  What you told me before about the Affidavit of
8 Indebtedness signed by Ms. Kenney, you don't know how
9 she came up with these numbers in here, do you?
10   A.  I don't.
11   Q.  Okay.  In the last sentence in the third full
12 paragraph on page 2 of your affidavit marked as Exhibit
13 No. 1, it reads, quote, ". . . this amount is just and
14 true, due and owing, and all just and lawful offsets,
15 payments and credits have been allowed."  Isn't that
16 right?
17   A.  Yes.
18   Q.  Okay.  How do you personally know this?
19   A.  I guess I have to take the word of people who
20 we pay and -- who are paid to perform these services.
21   Q.  And my question to you is, your only personal
22 knowledge before signing the affidavit had to do with
23 reviewing a spread sheet?
24   A.  That's correct.
25   Q.  That had only very basic information?

### Page 49

1    A.  That's correct.
2    Q.  And it wouldn't have really told you whether or
3 not all offsets and credits had been given; isn't that
4 right?
5    A.  No.  That's correct.
6    Q.  And without an entire -- access to an entire
7 payment history, you're not in a position to say of your
8 own personal knowledge whether or not all offsets,
9 payments, and credits have been allowed, are you?
10       MS. BRIGGS:  Objection.  Form.
11   A.  Only due to our agreement with Citibank when we
12 purchased this block am I able to say that.  I'm aware
13 of what the terms of the agreement are, and that says
14 that we have a, quote, "clean debt," that everything has
15 been taken care of by Citibank, and there's no
16 subsequent payments or no dispute.  There has not
17 been -- nothing that would negate our purchase of that
18 specific account.
19   Q.  (By Mr. Tomlinson)  And the number given to it?
20   A.  That's correct.  Now, as you know, there's
21 thousands of accounts involved with that purchase.
22   Q.  The fourth page of Exhibit No. 1 is called a
23 Unifund statement.  You mentioned before that this was
24 never sent to the --
25   A.  The debtor.

JOSEPH LUTZ - April 26, 2007

14 (Pages 50 to 53)

Page 50

1    Q.  -- consumer?
2    A.  It's just sent to our law firm.
3    Q.  Okay. Is this the only piece of information
4    that's sent to the law firm when they are preparing a
5    lawsuit?
6    A.  I doubt it. I don't know exactly what's sent
7    to the law firm.
8    Q.  All right. Now, when you sign this affidavit
9    marked as Exhibit No. 1, this had been prepared by
10   Hull & Associates; correct?
11   A.  Yes.
12   Q.  And even seems to so indicate at the bottom --
13   A.  That's correct.
14   Q.  -- in the footer; correct?
15   A.  Uh-huh. Yes.
16   Q.  I'm sorry. She can't take an uh-huh.
17   A.  I agree, yes.
18   Q.  I'm sorry. I apologize.
19       Is this -- what is marked as Exhibit A on
20   the bottom of it, is this the only thing you know for
21   sure that goes to the law firm before these affidavits
22   are prepared?
23   A.  Yes.
24   Q.  Okay. Do you happen to know why it says at the
25   bottom of this page marked as "Unifund Statement" in

Page 51

1    Exhibit A, it says, "This communication is from a debt
2    collector. Federal laws requires us to inform you that
3    this is an attempt to collect a debt and any information
4    obtained will be used for that purpose"?
5    A.  I don't -- I mean, that's standard for debt
6    collectors, and we -- all I can tell you is that it is
7    sent to our law firm. We do not mail out those
8    statements.
9    Q.  Okay. Is it typically added or attached to the
10   petition or complaint that's filed in court, to your
11   knowledge?
12   A.  I don't -- I've not seen it.
13   Q.  You have no idea?
14   A.  That's correct.
15   Q.  Okay. That's fine. Do you know when
16   Ms. Huffman's account started with Citibank?
17   A.  I have her account was opened 4-1 of 1998.
18   Q.  And how do you have that information?
19   A.  It was obtained from Citibank.
20   Q.  When?
21   A.  When I requested it.
22   Q.  When was that?
23   A.  When I determined that we were going to go to
24   litigation on this account.
25   Q.  Not at the time you signed the affidavit here

Page 52

1    marked as Exhibit 1?
2    A.  When we got this block of information, that was
3    part of the information which was available when we got
4    this block of charged off credit card debt.
5    Q.  So is it for each account that's part of a pool
6    of accounts that you purchased, you get a little screen
7    or a portion of a screen that gives you some basic
8    information about an account?
9    A.  Yes.
10   Q.  And one of the bits of information on there is
11   the date the account was opened?
12   A.  That's correct.
13   Q.  Is that the only bit of information that's not
14   also on the Unifund statement?
15   A.  Well, this is information I have available.
16   Q.  I know. I'm just trying to find out what else
17   might be on that computer screen as opposed to what's on
18   this Unifund statement?
19   A.  It's got the charge-off date, the last payment
20   date, the last activity date, account number, date of
21   birth, social security number.
22   Q.  Tell me what you show to be the charge-off
23   date?
24   A.  Charge-off date was 1-13-2003.
25   Q.  And that reflects that the account went into

Page 53

1    default sometime within a 180-day period before that;
2    isn't that right?
3    A.  Yes.
4    Q.  It could have gone into default sometime like
5    in July of 2002, more likely than not?
6    A.  I would say the last payment date was 11-4 of
7    2002.
8    Q.  But do we know if that last payment rendered
9    her current?
10   A.  No.
11   Q.  My point is, is that for accounting purposes a
12   bank has to charge off an account six months or 180 days
13   after it goes into default?
14   A.  That's correct.
15   Q.  And even if you make a payment during that six
16   months or 180-day period, if that payment doesn't render
17   the account current again, the clock is still running?
18   A.  That's correct.
19   Q.  And they still have to do -- charge it off 180
20   days or six months after it initially went into default?
21   A.  You're correct.
22   Q.  Okay. My point being is this account may well
23   have gone into default sometime in July of 2002 and
24   remained in that status even though there was a payment
25   in November of 2002?